**IN THE COURT OF APPEALS OF IOWA**

No. 24-0340
Filed May 7, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRADLEY MARTIN OSBORN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Korie Talkington, Judge.

A defendant appeals his consecutive sentences for two counts of aggravated misdemeanor assault. **SENTENCE AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR ENTRY OF A CORRECTED SENTENCING ORDER.**

Kent A. Simmons, Bettendorf, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney General, for appellee.

Considered without oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

"[S]omeone picking their teeth off the parking lot at the Guitar Center is impactful and sticks with me." That stark imagery from the victim impact statements drove the district court's decision to impose consecutive sentences of 180 days in jail and a two-year suspended term for Bradley Osborn's assault convictions. Osborn appeals that sentence, alleging the district court considered only the nature of the offenses when denying his request for deferred judgment. As for the consecutive terms, Osborn claims it was impermissible for the court to rely only on the existence of two victims. Finally, Osborn argues the court's designation of the county jail as the place of confinement was illegal.

On that last point, the State concurs. But the State defends the rest of the sentence and asserts that remand for entry of a corrected sentencing order will resolve the place-of-confinement issue.

We agree that resentencing is not required. The record does not support Osborn's claim that the district court failed to weigh the pertinent sentencing factors. Neither does it show that the court relied on an improper reason for running the sentences consecutively. *See State v. Millsap*, 704 N.W.2d 426, 435 (Iowa 2005) ("[T]he existence of two victims is clearly a circumstance of the crime."). Finding no abuse of discretion, we affirm Osborn's consecutive sentences. We remand solely for the district court to commit Osborn to the custody of the director of the Iowa Department of Corrections (DOC).

I.      **Facts and Prior Proceedings**

Osborn is challenging his consecutive sentences for two aggravated misdemeanors committed in January 2023. He originally faced class "D" felony

charges for two assaults without the intent to cause serious injury but causing serious injury in violation of Iowa Code section 708.2(4) (2023). In the February 2023 trial information, the State identified T.J. as the victim in the first count and his son, M.J., as the victim in the second count. In October 2023, the State amended the trial information to add two counts of assault with the intent to inflict serious injury, both aggravated misdemeanors under section 708.2(1). The third count named T.J. as the victim and the fourth count named M.J. as the victim. After the amendment, Osborn agreed to plead guilty to counts three and four. The parties were free to argue for any available sentence. But the State agreed to take no position on any request for a deferred judgment.

At sentencing, the district court heard varying narrations of how the assaults happened. First, in his allocution, Osborn gave this view of a surprise encounter with an old acquaintance that ended badly:

> I found myself entangled in an unfortunate incident with [T.J.] and [his son M.J.] at Guitar Center in Davenport, Iowa. In the month of January last year I visited the Guitar Center, and while in the room dedicated to acoustic guitars, I was approached by [T.J.], who apparently thought I was an employee of the establishment. Our acquaintance dates back approximately eight years when we first connected over a Craigslist transaction involving a table saw. After many meetings, discussions, and other dealings, [T.J.] joined my home building business, bringing with him a promise of valuable experience and project manager skills. However, as time progressed, our professional relationship took a downward turn. After some dealing with [T.J.] went sideways, I reached the decision that I would have to sever ties with [T.J.]. After that time I never attempted to contact [T.J.], never looked for him, never tried to find out where he lived or where he was working, and never saw him again until the evening he approached me at the Guitar Center. Looking up and realizing it was him, I asked, are you [T.J.]? I asked him several times if he remembered me. I reintroduced myself and asked him if he was still planning on paying back the loan of $5,000. His immediate response was, are you kidding me? Do you know how much money you cost me? After some back and forth, I got up

and left the store with him following me, as he stated in the police camera interview.

I certainly was not looking for any type of altercation to ensue. That was the reason I left the store. I wish the physical nature of our interaction did not happen. I was perfectly fine living the remainder of my life never seeing [T.J.] again. This was something that is not in my character, and I would change the way it all ended if I could. I was certainly not the only person involved in the altercation, but I am here willing to accept the consequences for my role in it. I was fully cooperative with law enforcement and stayed on the scene to make sure I was there to speak with them.

But 23-year-old M.J.'s victim impact statement painted a more ominous

picture of trying to stop Osborn's attack on his father.

My name is [M.J.] and I am one of the two victims involved in that abhorrent assault. . . . When I was a teenager, my father spent some time working for Brad Osborn's business. One of my father's many skill sets resides within residential and commercial construction, and the Osborns hired my father to help them build homes in the Quad City area. . . . Eventually the Osborns and my father parted ways and we really never heard from any of them again. We went without contact with Brad and his parents for years until Brad recognized my father at the Guitar Center in Davenport this past January. . . .

Now, I remember this day very vividly. On this day my father asked me several times if I was willing to run errands with him, and I kept saying no. For whatever reason, I was busy, or I didn't want to go out because it was cold, but eventually my father offered to buy me lunch if I went with him, so I agreed. When we arrived at Guitar Center I opted to stay in the vehicle while my dad went inside. I see him walk out just six or seven minutes later in some sort of argument with someone that I couldn't recognize. The truck windows were rolled down a couple of inches, so I can hear the fact this was a verbal altercation, and our truck was parked roughly 10 to 15 feet away. At this point I was already on edge, and I was ready to exit the vehicle in order to be with my father. And at this point in time I saw Brad punch my dad in his mouth several times and knock him to the ground. As fast as I could move I ran to get in between my father and Brad, but it was too late. Brad had already knocked many of my father's teeth out. My dad's mouth was gushing blood and his teeth were scattered across the concrete. . . .

M.J. also described his own injuries.

> By the time the police and medics arrived, I remember feeling like I was going to pass out. Brad had punched me and I ended up hitting my head on a metal bike rack pretty hard. I never could have guessed in the wildest corners of my imagination that this altercation was going to take place. My father and I spent the rest of the afternoon and evening in the Genesis East ER. I had two broken toes as well as an injured wrist, but my father wasn't so lucky. He lost almost all his teeth and had to endure stitches through his tongue.

Finally, T.J. gave his victim impact statement, emphasizing his dental injuries and the aftermath of the assault:

> My son laid it out pretty clearly and pretty succinctly. You know, you mentioned something about a $5,000 loan, which is not true. . . . But you see this (witness indicating)? Every one of you see it? That's what that man did. Knocked out this bridge, knocked out this bridge, fractured my neck, fractured my jaw, and knocked out the teeth on this side. It wasn't just a fist. There's no way a fist makes that kind of damage. I had stitches in my tongue. . . . Haven't worked since this incident. . . . I want to be made whole, Judge. That's what happened. I used to have teeth like everybody else in here. This is what I got now (witness indicating). I don't have the 20, $30,0000 that it takes to do this. I've gotten estimates. Because I'm a heart patient, because I'm on blood thinners, because I've got five stents and have had two major heart attacks, there is only one oral surgeon in three states that took me eight months to find that will even deal with this, because there are parameters to deal with this kind of surgery. . . . So here we are. The very first thing I want is to just be made whole again; that's all. That's all I really want. I want my teeth back, Judge.

Against that factual backdrop, defense counsel requested a deferred judgment for his client, who was fifty-three years old and had no criminal history. In counsel's view: "The likelihood of him re-offending is really low." By contrast, the State lobbied for consecutive sentences of 365 days incarceration, with all but thirty days suspended on each count, for a total of sixty days in jail.

The district court assured the parties that it had scrutinized the record and devoted considerable thought to the proper sentence: "there's such a wide range of possible appropriate punishment here. There's so many factors." The court noted Osborn's age and his lack of criminal history. But it also highlighted that "the conduct and the injury, the attendant circumstances, the nature of the offense are all someone picking their teeth off the parking lot at the Guitar Center is impactful and sticks with me."[1]

The court then sentenced Osborn to a suspended two-year prison term on count three and 180 days in jail on count four. The court ordered the sentences to run consecutively "[b]ased on the fact that we have two separate victims, both suffering serious injuries."[2] Osborn appeals his sentence.[3]

## II. Scope and Standards of Review

"Our review of a sentence imposed in a criminal case is for correction of errors at law." *Damme*, 944 N.W.2d at 103 (citation omitted). Because it falls within the statutory limits, Osborn's sentence is "cloaked with a strong presumption in its favor." *See State v. Smith*, 17 N.W.3d 355, 358 (Iowa 2025) (citation omitted). We will vacate the sentence if the district court abused its discretion or considered

---

[1] In its written sentencing order, the court listed these considerations: the plea agreement of the parties; the victim impact statements; the defendant's criminal history, or lack thereof; the defendant's propensity for further criminal acts; the defendant's age and character; the defendant's employment; and "[a]dditional reasons as stated on the record."

[2] The court left the restitution amount open so that the State could gather evidence on the cost of T.J.'s dental reconstruction.

[3] Good cause exists under Iowa Code section 814.6 to appeal following Osborn's guilty pleas because he is challenging his sentence, "which was neither mandatory nor agreed to as part of [his] plea bargain." *State v. Damme*, 944 N.W.2d 98, 105 (Iowa 2020).

inappropriate matters. *Id.* Once the court has settled on a sentence, it must state its reasons on the record, including the reasons for consecutive sentences. *State v. Duffield*, 16 N.W.3d 298, 303 (Iowa 2025). We review Osborn's challenge to the court's designation of the county jail as the place of confinement for correction of errors at law. *See State v. Patterson*, 586 N.W.2d 83, 83 (Iowa 1998) (per curiam).

### III. Analysis

Osborn contends that the district court abused its discretion by "only considering one valid sentencing factor as a reason" for imposing a sentence of incarceration. In his view, "[t]he sentence was all about the teeth." He also downplays the extent of T.J.'s injuries, stressing that the victim brought "a couple of teeth" with him to the hospital but told the emergency room physician that he did not want them reinserted. He asks: "Did the judge have good reason to doubt [T.J.] about the extent of the dental injury Brad Osborn had caused? Of course she did."[4]

As Osborn points out, district courts must weigh all pertinent matters in determining a proper sentence, "including the nature of the offense, the attending circumstances, defendant's age, character and propensities and chances of his reform." *See State v. Laffey*, 600 N.W.2d 57, 62 (Iowa 1999) (citation omitted). On top of those factors, Iowa Code section 901.5 requires the court to determine

---

[4] Osborn contends that, in his written guilty plea, he did not admit as true all facts in the minutes of testimony. But the written plea did acknowledge that the minutes were "substantially true insofar as necessary to provide a factual basis" for the offenses to which he was pleading. And although it does not impact our analysis of his sentencing claims, Osborn's admission in the written plea was that he "committed an act which [he] intended to commit that caused serious injury to another." Causing serious injury was not an element of the aggravated misdemeanor assaults. *Compare* Iowa Code § 708.2(4) (2023), *with* § 708.2(1).

which sentence "will provide maximum opportunity for the rehabilitation of the defendant, and for the protection of the community from further offenses by the defendant and others."

But contrary to Osborn's assertions, the sentencing court considered more than just the nature of T.J.'s injuries. It noted that Osborn had reached his mid-fifties with no criminal convictions. But the court decided the nature of the assaults overshadowed his law-abiding history. That determination was within the court's discretion. *See State v. Hopkins*, 860 N.W.2d 550, 555–56 (Iowa 2015) (rejecting request for probation despite defendant's "virtually nonexistent" criminal history). We find no cause for resentencing despite the court's failure to mention other mitigating factors. *See State v. Boltz,* 542 N.W.2d 9, 11 (Iowa Ct. App. 1995) (explaining the duty to consider pertinent sentencing factors does not require court to "specifically acknowledge each claim of mitigation urged by a defendant"). And although Osborn criticizes the "boilerplate" nature of the checklist in the form sentencing order, we find that—in combination—the oral colloquy and the written order reveal a sound rationale for his sentence. *See State v. Luke*, 4 N.W.3d 450, 457–58 (Iowa 2024).

We also find the court's reason for the consecutive sentences meets the test from *State v. Hill*, 878 N.W.2d 269, 273 (Iowa 2016). The court said that it was imposing consecutive sentences because Osborn assaulted T.J. *and* M.J., who both suffered serious injuries. Osborn maintains that it was impermissible under *Laffey* to impose consecutive terms based solely on the existence of two victims. *See* 600 N.W.2d at 62. But *Millsap* clarified *Laffey*. *See* 704 N.W.2d at 435 ("*Laffey* is distinguishable because in that case the sentencing court did not

rely simply on the existence of multiple victims."). In *Laffey*, the court found that it was improper to consider "the difficulty . . . in explaining" a concurrent sentence to two victims because that explanation did "not go to the nature or severity of the offense" and was "unrelated to the circumstances of the crime." 600 N.W.2d at 62. By contrast, in *Millsap*, the fact that the defendant's actions caused two deaths increased the severity of the offense. 704 N.W.2d at 435. The same is true here. The existence of two assaults and two victims with serious injuries is a circumstance of Osborn's criminal conduct and an appropriate basis for consecutive sentences.

Finally, we turn to the parties' common ground. They agree that the county jail was not the proper place of confinement for a sentence of more than one year. *See* Iowa Code § 903.4; *Patterson*, 586 N.W.2d at 84 ("While the suspension of the sentences prevents or delays their execution, it does not alter their character as sentences of confinement."). The State contends that we should remand with directions for the district court to enter an order vacating the portion of the sentencing order designating placement at the county jail and replace it with commitment to the DOC director. In comparable situations, we have taken the route suggested by the State. *See State v. Boehmer*, 967 N.W.2d 191, 198 (Iowa Ct. App. 2021) ("Full resentencing is not required."). And we do so again here. We do not believe that *Duffield* dictates a different result. *See* 16 N.W.3d at 303−04 (explaining that remanding a case for plenary resentencing is presumed remedy where the district court fails to articulate its reasons for a prison sentence).

**SENTENCE AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR ENTRY OF A CORRECTED SENTENCING ORDER.**